Filed 8/25/25  In re H.F. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re H.F., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>Y.F.,<br><br>    Defendant and Respondent;<br><br>H.F., a Minor, etc.,<br><br>    Appellant. | A171316<br><br>(San Francisco City & County Super. Ct. No. JD23-3362) |

H.F. (Minor) appeals from the juvenile court's order dismissing a dependency petition filed by the San Francisco Human Services Agency (the Agency) on her behalf.  (Welf. & Inst. Code,[1] § 350, subd. (c).)  Minor claims the court's order is unsupported by substantial evidence.[2]  We affirm.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] The Agency did not file a notice of appeal but filed a document stating that it joins in Minor's arguments.

# I. BACKGROUND

Y.F. (Father) has two children by his ex-wife L.F. (Ex-Wife), S.F. (born in 2013) and X.F. (born in 2016). He separated from Ex-Wife in 2019 and did not see those children for about two years. Meanwhile, he met Minor's mother Y.L. (Mother) in 2020, and Minor was born in October of that year.

In November 2020, Mother contacted law enforcement. Officers responded to Mother and Father's home in Santa Clara County and determined the pair had two arguments that "became physical," resulting in bruises and scratches to both. It was reported to the Santa Clara County Department of Family and Children's Services (Santa Clara Children's Services) that the newborn Minor had been in the living room with the parents when these incidents happened. "Law enforcement . . . considered [Mother] the aggressor," but did not arrest her because she was caring for Minor. Santa Clara Children's Services investigated allegations of emotional abuse and general neglect to newborn Minor by Mother and Father and found the allegations inconclusive.

Father and Mother moved to San Francisco together, but their relationship ended in March 2022. Mother moved back to Santa Clara County with Minor. In custody proceedings that followed, the family court ordered joint legal and physical custody of Minor, with visitation to Father twice a week. In early 2023, the family court increased Father's visitation to include an overnight from Friday evenings to midday on Saturdays and a second overnight during the week. In early 2024, the family court again increased Father's visitation to a "split week schedule." The family court denied Mother's request for a finding under Family Code section 3044 that Father had perpetrated domestic violence.

2

*A.      Reports to the Agency and Santa Clara Children's Services*

Father's parents lived in Canada but took turns staying in his home after he separated from Mother.  In November 2023, Father's mother (Grandmother) reported that during weekend visits with Minor and his older children, Father made the older children clean his house for four hours every weekend until someone from their school spoke to him about this; required the older children to undress in front of him (and sometimes paternal grandparents) and shower upon entering his home, and to report details about their showering and other bathroom use to him; and would threaten the children and say he would not feed them if they did not comply with his demands.  Grandmother believed that Father had a mental health condition and stopped staying with him soon after her initial report.

In subsequent interviews, Grandmother described other restrictive requirements that Father imposed on the older children and said Father yelled at them and neglected or interfered with X.F.'s needs around eating, sleeping, using the bathroom, and a food allergy.  X.F. and S.F. gave consistent descriptions of Father's conduct and said he told them not to talk about what happened in his home.  Father denied his conduct was inappropriate and denied having any mental health issues.

Grandmother reported that Father required the older children to take care of Minor and would not attend to Minor when she cried during the night. He would wake Minor for meals but immediately put her back to bed and would yell at her if she opened her eyes while in bed or moved too much when he took videos of her.  But Minor was not subjected to the same treatment as the older children because she was Father's "favorite child," and was too young to understand what was happening to her.  S.F. reported that when Minor arrived at the home, either Father or the older children would remove

her clothes except for her diaper, wipe her with baby wipes, and dress her in clean clothes.

Mother reported that Minor would scream and throw tantrums after returning from visits with Father and sometimes woke during the night crying uncontrollably. When she began speaking, Minor would say she did not want to go to Father's home. Once, Minor returned from Father's home with scratches and rashes on her legs and back, and another time her socks were full of dirt, dust, and hair. Mother noticed rashes on Minor's private parts when she returned from a visit with Father at the end of 2023. She was concerned about sexual abuse and took Minor to see doctors, but they told her Minor's rash was normal and to stop checking her private parts so often because there were no signs of abuse, and it could make Minor nervous. After these medical appointments, Mother reported she was no longer concerned about potential sexual abuse. Santa Clara Children's Services investigated and determined that the allegations of sexual abuse were unfounded.

**B.      *Initial Dependency Proceedings***

In December 2023, the juvenile court issued removal warrants as to all three children. The Agency filed a dependency petition on behalf of Minor, who remained with Mother. It alleged that (1) Minor was at substantial risk of serious physical harm or illness due to Father's mental health issues, Mother and Father's incident of domestic violence, and Mother's inability to protect Minor from harsh treatment during her time at Father's home (§ 300, subd. (b)(1)); (2) Minor was suffering serious emotional damage from Father's conduct (*id.*, subd. (c)); and (3) Minor had been subjected to acts of cruelty by Father (*id.*, subd. (i)). The Agency twice amended its petition, ultimately dropping the allegations concerning Father's mental health and acts of

4

cruelty, amending the section 300, subdivision (c) allegation to allege Minor was at risk of suffering serious emotional damage, and adding an allegation that Minor's half siblings were abused or neglected and there was a substantial risk that Minor would be abused or neglected (§ 300, subd. (j)). The Agency filed a separate dependency petition as to S.F. and X.F.

In its initial jurisdiction report, the Agency recommended that the dependency petitions be sustained and then transferred to Santa Clara County (where S.F. and X.F. also lived) for disposition. In two addendum reports, it recommended that the petitions be sustained as to all three children, with sole physical custody to Ex-Wife and Mother, respectively, visitation to Father, and joint legal custody.

The juvenile court heard testimony at contested detention proceedings concerning Minor in January 2024, found prima facie evidence of the facts required for dependency jurisdiction, and temporarily placed Minor with Mother. The court then held a contested jurisdiction hearing concerning all three children over several days from May to September 2024. Meanwhile, it ordered visitation between Minor and Father, beginning with weekly supervised video visits and adding supervised in-person visits. At first, the in-person visits were not successful as Minor would cry and scream when Agency staff attempted to transport her to San Francisco. When the venue was changed to Santa Clara County, the visits were successful.

Father participated in parenting and fatherhood groups and voluntarily worked with a clinician at a child trauma research project. The clinician reported that Father was "rigid[]" in his thinking and had trouble considering Minor's perspective or experience. She noted "this d[id] not necessarily rise to the level of a safety risk, but would continue to impact his connection and relationships with his children." The Agency reported that

5

Father's video visits with Minor were "adequate" and Minor "appear[ed] to enjoy in person visits and playing outside with" Father and did not seem afraid of him. Still, the Agency was "concerned that [Father] present[ed] well in front of others, including visitation staff and providers," for limited periods of time, but "[t]he worry is how he will behave as [Minor] grows and becomes more independent" and "voice[s] her own needs and wants." And the Agency still had "questions" about Father's "mental health and parenting style."

## C.  *Jurisdiction Hearing*

At the contested jurisdiction hearing, Grandmother testified about the conduct she reported to the Agency and explained that she felt it was better for S.F. and X.F. to be raised by Ex-Wife because Father "needs psychological counseling." Grandmother felt that Father gave up on his older two children when he had Minor. She was worried about all three children, though she did not think Father was intentionally trying to hurt them, and she had asked Father to "step aside" from parenting and move to Seattle so she could care for him. Still, Grandmother told the social worker that Minor was not subject to the same mistreatment as the older children. While Minor may have been present when Father yelled at the other children, she did not "understand that and she d[id]n't care about all that. She was just jumping around playing," or sometimes "sleeping." Grandmother testified that Father "loves [Minor] very much and [is] very careful with her." "He likes her especially much. He loves and protects her." Grandmother stated that "for the sake of [Minor], everybody else ha[d] to be sacrificed": for example, Father made X.F. read by the small light on the top of the oven to avoid disturbing Minor's sleep. Grandmother had not seen Father with his children or been in his home since 2023.

The social worker who first investigated Grandmother's report testified that she told Grandmother Father would probably treat Minor the same way as the other children when she grew up. She concluded that Minor "might have anxiety" based on information provided by Mother. She "could not get direct information" from Minor about how she felt with Father because Minor "was too young" and "did not want to engage." Minor did tell the social worker she did not want to go to Father's house, but the social worker did not ask why. The social worker confirmed that the primary reason the Agency had pursued the case was because of information provided by Grandmother and confirmed by the older children.[3]

Another social worker continued the investigation. She testified that S.F. and X.F. reported that Father would yell at them and Minor. Mother reported that when she lived with Father, he was controlling and coercive towards her, including sexually, and he had since been focused on "win[ning]" the family court litigation rather than Minor's interests. Mother was concerned that Minor was unable to stand up for herself if she felt unsafe or uncomfortable with Father given her age. The social worker interviewed Father, who "was very open to talk about all of the [Agency's] allegations and concerns" and "had a clear answer to each point" from his own perspective: "for example," as to monitoring "the [older] children's bathroom habits [and] looking at the color of their urine, that was all in the name of health because that's what the doctor recommended and that's how you tell if a child is well hydrated." But while Father had "a reason for all of his actions that he f[ound] reasonable," the social worker assessed that "some of these parenting

_____

[3] Grandmother and this social worker initially testified during the first day of the contested jurisdiction hearing, but the reporter's transcript of that part of their testimony is not in our record.

7

decisions are not necessarily reasonable and they are negatively impacting the kids." Father declined to share any information about his childhood history, mental health, and other topics beyond the allegations of the petition.

The social worker spoke to Minor, although "the conversations [were] brief" given her age. Minor stated on a few occasions that she didn't like or want to visit Father, and when the social worker asked her about him, Minor was "avoidant" and appeared not to "want[] to talk about it." The social worker acknowledged, however, that notes from the supervised visits reflected that those visits went "well" and Minor "enjoy[ed] th[at] time."

Father presented appropriately at his sessions with the child trauma research clinician. In the social worker's view, while Father "present[ed] very well to everyone" and went "to every single one of his parenting sessions or appointments" and "participate[d]," his participation was "superficial." Fundamentally, she was concerned that he did not "believe" his children's experience and "that they are fearful of him, that his behavior is doing something to make them not want to spend time with him or feel comfortable in his care." Father did express that he wanted to go to therapy and have visitation with the children, and the social worker thought his "desires [we]re genuine to do better," but she was "not sure that he's shown that he's capable at this time." The social worker was aware that Father was going to individual therapy to address issues including anger management, domestic violence, and parenting, which helps reduce future risk.

## D. *The Juvenile Court Dismisses the Petition*

After the Agency rested its case-in-chief, Father's counsel moved to dismiss the petition on behalf of Minor and the juvenile court heard oral argument on that motion. The court explained that it "considered [Minor]'s

age" and the evidence concerning S.F. and X.F. "and the nature of those allegations." The court inferred from the first social worker's testimony that Minor was "only here because of concerns about the siblings," and noted Grandmother's testimony that Minor was "the more favored child" and "she was not concerned" about Minor's "safety with [Father]." In response to a question from the Agency's counsel, the court specifically found that "at the present time, there's no substantial risk to [Minor] on the J count." The court dismissed the petition in favor of the family court's custody orders.

## II.  DISCUSSION

Minor challenges the juvenile court's rulings that she was not subject to its jurisdiction under section 300, subdivisions (c) and (j). She does not contest the court's ruling as to subdivision (b)(1) of section 300 and so has forfeited any challenge to that ruling. (*Lake Lindero Homeowners Assn., Inc. v. Barone* (2023) 89 Cal.App.5th 834, 838, fn. 2 (*Barone*) [contentions not raised and supported in opening brief are forfeited].)

We review a juvenile court's order dismissing a section 300 petition for substantial evidence. (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199 [affirming such an order where minor recanted allegations of abuse].) We defer to the court's factual findings and credibility determinations absent "indisputable evidence" that a minor was subject to the court's jurisdiction. (*Id.* at pp. 199–200.) In other words, unless we are presented with "evidence that no reasonable trier of fact could have rejected," we must affirm. (*In re Jordan R.* (2012) 205 Cal.App.4th 111, 138 [affirming orders sustaining section 300 allegations as to daughter but dismissing as to son].)

Minor argues that the juvenile court should have found she was at substantial risk of serious emotional damage as described by section 300, subdivision (c) (subdivision (c)) and that she was at substantial risk of abuse

or neglect following her half siblings' abuse or neglect as described by section 300, subdivision (j) (subdivision (j)). She urges that during earlier, unsupervised visits, Father made her stay in bed for excessive periods, yelled at her when she opened her eyes, wiped her down when she arrived at his home, and excessively photographed her. She argues she was at substantial risk of serious emotional damage, abuse, or neglect considering Father's treatment of his older children, which she witnessed.

Subdivision (c) provides that a child comes within the jurisdiction of the juvenile court if "[t]he child is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent . . . ." (§ 300, subd. (c).) This subdivision "seeks to protect against *abusive* behavior that results in severe emotional damage. We are not talking about run-of-the-mill flaws in our parenting styles—we are talking about abusive, neglectful and/or exploitive conduct toward a child which causes any of the serious symptoms identified in the statute." (*In re Alexander K.* (1993) 14 Cal.App.4th 549, 559.)

Subdivision (j) allows juvenile court jurisdiction where a "child's sibling[s] ha[ve] been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i) [of section 300], and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions. The court shall consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child." (§ 300, subd. (j).) Section 300 explicitly cautions that "[i]t

10

is the intent of the Legislature that this section not disrupt the family unnecessarily or intrude inappropriately into family life, prohibit the use of reasonable methods of parental discipline, or prescribe a particular method of parenting." (§ 300.)

We understand the concerns voiced over Father's conduct and Minor's fears that he may treat her differently as she gets older. But we do not reweigh the evidence and reevaluate her arguments from scratch; we consider only whether the juvenile court's findings were supported by substantial evidence. We must also bear in mind that " '[w]hile evidence of past conduct may be probative of current conditions, the question under section 300 is whether circumstances *at the time of the hearing* subject the minor to the defined risk of harm.' " (*In re Ma.V.* (2021) 64 Cal.App.5th 11, 23 [reversing jurisdictional findings on this ground]; *In re S.F.* (2023) 91 Cal.App.5th 696, 712–714 [same].)

As the juvenile court observed, Minor was very young when the conduct at issue took place, and the conduct was largely directed at Father's older children. Minor does not claim to have suffered serious emotional damage from Father's past behavior; her concern focuses on the possibility that she is at risk in the future. But she does not claim she will be exposed to further interactions between Father and his other children akin to those that most concerned the Agency and Grandmother. The juvenile court also had before it information that Father regularly participated in visits with Minor that went well, and participated in services intended to address the Agency's concerns regarding Minor. Moreover, the court was not required to accept the Agency's assessment of the ongoing risk to Minor. (See *In re S.F.*, *supra,* 91 Cal.App.5th at pp. 717–718.) It was entitled to assign more weight to other evidence, including Grandmother's view that Minor was not treated

like her siblings and did not appear to be affected by how Father treated them, and that Father was very careful with Minor. Minor's case authorities are not to the contrary: all upheld a juvenile court's jurisdictional findings rather than reversing as Minor would have us do.[4]

"Our review of the record, in short, does not persuade us that there was indisputable evidence of abuse." (*In re Sheila B.*, *supra*, 19 Cal.App.4th at p. 200.) Accordingly, we find that substantial evidence supported the juvenile court's determinations that Minor was not at substantial risk of serious emotional damage, abuse, or neglect as described by subdivisions (c) and (j) at the time of the jurisdiction hearing. (See § 350, subd. (c) [at the close of evidence where the burden of proof has not been met, the juvenile court must order whatever action the law requires of it, including dismissal of the petition].)

## III. DISPOSITION

The juvenile court's order is affirmed.

---

[4] Minor's cited authorities concerning subdivision (c) involved circumstances where a parent's continuing conduct towards their children caused the children to experience "severe anxiety and emotional damage" (*In re A.J.* (2011) 197 Cal.App.4th 1095, 1104), exposure to "constant arguments," "domestic violence," and a parent's alcoholism (*In re D.P.* (2015) 237 Cal.App.4th 911, 919), or "violence, systematic verbal abuse, racism, impulsivity, and lack of insight" (*In re D.B.* (2020) 48 Cal.App.5th 613, 621–623). Minor's cases discussing subdivision (j) are factually inapposite as they dealt with a severity of sibling abuse including traumatizing corporal punishment (*In re D.B.* (2018) 26 Cal.App.5th 320, 331) and extreme sexual abuse (*In re D.C.* (2015) 243 Cal.App.4th 41, 53–54, superseded by statute on other grounds as stated in *In re A.M.* (2020) 47 Cal.App.5th 303, 322) that justified amplification of the juvenile courts' concerns for the younger minors' safety. To the extent that Minor argues that her circumstances resemble these cases, we disagree.

SMILEY, J.

WE CONCUR:

HUMES, P. J.

LANGHORNE WILSON, J.

A171316
*In re H.F.*